UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LASSEN MUNICIPAL UTILITY DISTRICT,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>KINROSS GOLD U.S.A. INC., LASSEN GOLD MINING, INC., and DOES 1-50,<br><br>　　　　Defendants. | No.  2:11-cv-00255-MCE-CMK<br><br>**MEMORANDUM AND ORDER** |

　　　Through the present action, Plaintiff Lassen Municipal Utility District ("Plaintiff" or "District") seeks to nullify its December 2007 purchase of the so-called Hayden Hill 69kv power transmission line in Lassen County, California (the "Hayden Hill Line").  Causes of action for declaratory relief and restitution are asserted in Plaintiff's complaint, which was removed to this court under the auspices of its diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

　　　Presently before the Court is Plaintiff's Motion for Summary Judgment, which argues that Plaintiff is entitled to judgment as a matter of law on grounds that its former General Manager, Frank Cady, lacked the requisite authority to execute a sales contract for purchase of the Line.

1

According to Plaintiff, defenses like ratification and equitable estoppel are unavailing for purposes of rendering the contract enforceable. Alternatively, even if the Court finds that triable issues of fact render summary judgment as a whole unavailable, Plaintiff goes on to request that the Court summarily adjudicate Cady's purported lack of authority to bind Plaintiff to the sales contract. Finally, summary adjudication is also requested as to the affirmative defenses pled in Defendants' answer, including ratification, equitable estoppel and laches.

For the reasons outlined below, Plaintiff's Motion for Summary Judgment will be denied. The alternative request for summary adjudication will be granted in part and denied in part.[1]

## BACKGROUND

Plaintiff was formed as a California municipal utility district in 1986 in accordance with the so-called Municipal Utilities District Act, California Public Utilities Code § 11501, et seq. (the "MUD Act"). Plaintiff's Statement of Undisputed Fact ("PUF") No. 1. Frank Cady, after previously serving a five-year stint as Plaintiff's General Counsel, acted as its General Manager from January 1, 2005 through January 4, 2008. Id. at No. 2.

By 2005, Defendant Lassen Gold Mining, Inc. ("LGMI"), a wholly owned subsidiary of Defendant Kinross Gold, U.S.A., Inc., ("Kinross")[2] had wrapped up mining operations at its Hayden Hill facility and began to perform reclamation activities to close the operation down. As part of that process, LGMI initiated plans to remove and remediate the above ground electrical transmission line that had provided power for mining activities. LGMI obtained contractor bids for the removal and disposal of the Hayden Hill line.

---

[1] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

[2] Id. at No. 4.

1  The low bid, which envisioned removal and relocation of salvageable components, along
2  with disposal of non-salvageable components, was $38,000.00.  LGMI proceeded to
3  budget that amount for reclamation purposes for the year 2006.  Decl. of Kevin Roach,
4  Defs.' Ex. C, ¶¶ 3, 5.
5      In the meantime, a group of area landowners known as the Willowcreek
6  Landowners Association ("WCLA") approached LGMI about obtaining the Hayden Hill
7  line in order to secure electrical service for their properties.  The WCLA's initial attempts
8  to convince Lassen County not to require removal of the line, however, were apparently
9  unavailing.  Id. at ¶ 4, 11.[3]
10     On October 12, 2005, the issue of the Hayden Hill line was first broached during a
11 meeting of Plaintiff's Board of Directors.  Director Fred Nagel opined that he believed the
12 Line should not be removed.  The Board appointed both Nagel and the District's General
13 Manager, Mr. Cady, as liaisons for purposes of commencing discussions with Lassen
14 County on the issue.  October 12, 2005 Board Minutes, Defs.' Ex. H., p. 218.[4]  Cady
15 proceeded to approach Kinross' Director of Reclamation Operations, Kevin Roach, in
16 approximately April of 2006 about acquiring the Hayden Hill line.  Cady told Roach that
17 the acquisition of the line fit into the Plaintiffs' business plan and that its rights as a
18 municipal utility district could potentially allow it to acquire the line.  Roach Decl., Defs.'
19 Ex. C., ¶¶ 7-8.
20 ///
21 ///
22 ///
23

---

[3] The court notes that Plaintiff has interposed numerous objections to Defendants' evidence presented in opposition to this Motion.  To the extent the objected to evidence is cited herein, those objections are overruled.  With respect to any remaining objections, because the evidence at issue was not germane to the Court's decision, the Court need not rule on the validity of said objections and therefore declines to do so.

[4] Plaintiff has requested Judicial Notice, in accordance with Federal Rule of Evidence, with respect to various LMUD records, including Board of Directors Meeting Agendas, Minutes and Resolutions.  Many of those documents have also been offered by Defendants into evidence, some at the opposition of Plaintiff.  At any rate, Plaintiff's request is unopposed and will be granted.

3

By letter dated April 25, 2006 to Lassen County (and copied on Plaintiff's board and Special Counsel, as well as on Mr. Roach), Cady reiterated that "Lassen Municipal Utility District needs (the Hayden Hill line) as a strategic piece of its overall plan to make an intertie with the Bonneville Power Administration and other utilities in the Pacific Northwest." See Defs.' Ex J.  The Letter goes on to indicate that if Kinross fails to voluntarily convey the line to the District, then the District "would be willing to consider [its] acquisition… under the Eminent Domain Law, if that were appropriate." Id.

In September of 2006, after the WCLA's own efforts to acquire the line proved unsuccessful, the involved landowners delivered their own check in the amount of $30,000 to LMUD in order to assist in LMUD's own acquisition of the LMUD line.  That check was deposited by LMUD in its accounts.[5]   Thereafter, on November 1, 2006, Cady made a report to Plaintiff's Board "regarding the Hayden Hill Power Line acquisition." November 21, 2006 Board Minutes, Defs.' Ex.  M, p. 224.  In February of 2007, after price negotiations had ensued, Cady sent another letter to Kinross reiterating the District's "right… to exercise the condemnation power to take the pole line by eminent domain if we are unable to reach a mutually acceptable agreement through negotiation." February 21, 2007 letter, Defs.' Ex. O; Roach Decl., Ex. C. ¶ 13.

On June 20, 2007, after negotiating a tentative price and terms, Cady wrote to the WCLA, advising the landowners that Plaintiff and Kinross  "have completed the Contract and the Exhibits concerning the Easements and other matters for the acquisition of the Power Line."  Defs.' Ex. Q.  That letter was copied on Plaintiff's Board and counsel, and Director Nagel testified that the Board was briefed as to the negotiations and that no Board member raised any dispute or issue regarding the process of acquiring the Hayden Hill Line.  Nagel Dep., Defs.' Ex. F, p. 48.  Indeed, according to Nagel, Cady kept the District's Board of Directors informed as to the purchase status of the Hayden Hill line at virtually every Board meeting. Id. at pp. 25, 35.

---

[5] See Defs.' Ex. L; Dep. of William Stewart, Ex. C to Defs' Erratum in Opp., pp. 56-59; Frank Cady Dep., Ex. A to Erratum, p. 50; see also Defs' Motion to Supplement Evidence, ECF No. 22, Decl. of Van Thein, Ex. D, ¶¶ 2-3.

4

The agenda for Plaintiff's August 28, 2007 Board meeting listed the following item for closed session:

> B. Real Property
> …
> 3. Kinross Gold Hayden Hill Mine site- 69KV Transmission Line located on County Road A-2 and State Route 139.
> Agency Negotiators:  Frank Cady, Jaimee Jones and/or Dennis DeCuir
> Negotiating Parties:  Kevin Roach
> Under Negotiation:  Price and Terms.

August 28, 2007 Board Agenda, Defs.' Ex. R., p. 232.

Frank Cady testified that the District Board, in closed session, authorized him to execute a contract with Kinross if due diligence was completed and certain conditions precedent were met. Cady therefore believed he could sign the contract on Plaintiff's behalf once those conditions were satisfied. Cady Dep., Defs.' Ex. A to Erratum, pp. 12-14, 29-32, 37-38, 48-54, 57-58, 105-06, 124-125.

In his capacity as General Manager, Cady executed a Purchase and Sales Agreement ("PSA") for the acquisition of the Hayden Hill Line on or about December 17, 2007.[6] The agreement called for payment in the sum of $65,000.00 to Kinross. In exchange for that payment, the PSA called for Plaintiff to assume the duties and obligations attendant with ownership of the Hayden Hill Line. PUF Nos. 6-8. Because the contract had not yet been finalized by the addition of Defendants' signature, however, and because Cady's own signature occurred well after the August 28, 2007 meeting, Cady did not believe that development had to be reported as an action taken during closed session. Cady Dep., Defs.' Ex. A to Erratum, pp. 105-06.

The check for the purchase price in the amount of $65,000 was issued around December 13, 2007, and was signed by both Cady and Nagel, as Plaintiff's Treasurer, Moreover, Plaintiff's controller, William Stewart, stamped the check as a legitimate expense, attesting to the fact that it was a certified, authorized demand."

---

[6] Cady testified that he actually signed the PSA prior to December 17, 2007, because his authority to execute was prior to any signatures by the counter-party, here Kinross. Cady Dep., Ex. A to Defs.' Erratum, p. 105-106.

5

LMUD Check No. 20225, dated December 13, 2007, Defs.' Ex. T, Defs.' Erratum to Opp., Stewart Dep., Ex. C, pp. 15, 38.

The Minutes for Plaintiff's Board meeting of January 22, 2008, which occurred after Frank Cady's services as General Manager were terminated earlier that month, reflect that the check register from November 1, 2007 to January 18, 2008 was reviewed by the Board. No objection to the $65,000 check to LGMI dated December 13, 2007 was noted. January 22, 2008 Minutes, Defs.' Ex. W, pp. 251-52. The Minutes go on to indicate that the acquisition of the Hayden Hill line was discussed in closed session with no reportable action. Id. at p. 261. Additionally, the Agenda for the January 22, 2008 Board meeting contained a closed session item relating to acquisition of the line that was similar to the August 28, 2007 agenda, except that the negotiators were listed as Ray Luhring, Plaintiff's New General Manager, and Plaintiff's General Counsel, Jaimee Jones, rather than Special Counsel Dennis DeCuir. January 22, 2008 Agenda, Defs.' Ex W, p. 243.

Significantly, Director Bruce Nagel testified at deposition that after January of 2008, the District's Board continued to receive regular updates on the progress of efforts to facilitate use of the Hayden Hill line. According to Nagel, another regional electrical utility, Surprise Valley Electric, planned to use the Hayden Hill line until the District was ready to use it in order to tie into low cost power lines. Nagel Dep., Defs. Ex. F., pp. 72-73. As the Board minutes for May 27, 2008 attest:

> LMUD has a purchase agreement with the County [sic – Lassen Gold] and has taken possession of this line. LMUD is accepting liability for the line only. General Counsel Jones stated acquisition of the line requires mitigation and, if necessary, bond requirements. Dan Silviera, General Manager of Surprise Valley Electric, is interested in an operation and maintenance agreement with LMUD until the District is ready to take over the line.

Defs.' Ex. X, pp. 271. There is no indication that any officer or director of Plaintiff raised any issue as to the legitimacy of the purchase for two years.

///

6

1   Tellingly, the District's own letter of June 11, 2009 to WCLA homeowners, dated

2   June 11, 2009 and authored by Plaintiff's General Manager, Ray Luhring, states

3   unequivocally as follows:

> The Lassen Municipal Utility District ("District" concluded a Purchase and Sale Agreement for the existing de-energized 69kV line previously owned by Lassen Gold Mining in December of 2007. The line was purchased, along with easements for the line to the extent they were owned by Lassen Gold Mining, by the District for a total price of $65,000. In addition, the District spent considerable funds to retain outside counsel to aid in this purchase process."

Ex. A. to Defs.' Mot. to Supplement Evidence, ECF No. 82. The letter goes on to represent that "Surprise Valley Electric has reconfirmed their willingness to supply electric power through the subject line once the District successfully concludes the process of amending the reclamation plan and conditional use permit." Id. There is no hint in this letter, written some two-and-a-half years after Frank Cady entered into the agreement on the District's behalf, that the purchase was not properly sanctioned by the Board.[7] Indeed, as late as October of 2009, the District was still trying to make use of the Hayden Hill line. See Nagel Dep., Defs.' Ex. F, p. 83. The $30,000 paid by the LCRA landowners to defray Plaintiff's $65,000 acquisition cost was never refunded. William Stewart Dep., Defs.' Ex G, pp. 56-59.

Plaintiff's Board of Directors did not adopt a resolution finding that Cady had entered into PSA without authority until more than two years later when, on December 22, 2009, it passed a resolution disclaiming any approval or other ratification with respect to Cady's December 17, 2007 execution of the agreement. December 22, 2009 Resolution, Defs.' Ex Y.

///

///

---

[7] It should also be noted that the letter was not only forwarded to the landowners (See Decl. of Van Thein, Ex, D to Defs.' Mot. To Supplement Evidence, which confirms that Thein was one of the involved landowners and received a copy of the letter), but also sent to both Surprise Valley Electric and to Harold Garner, LMUD's previous counsel, and Dave Folce, Plaintiff's Director of Electrical Operations.

1  LGMI, for its part, indicates it received no indication whatsoever that Plaintiff intended to
2  attempt rescission of the PSA until slightly later, in early 2010, when Plaintiff's counsel
3  contacted Kevin Roach in an attempt to renegotiate the agreement. Roach Decl, Defs.'
4  Ex. C, ¶ 19.
5     According to Kevin Roach, he, in good faith, believed that Plaintiff's Board had
6  supported the PSA and that Cady had obtained all necessary authority to execute the
7  PSA. Id. at ¶ 14. That belief is supported by the terms of the PSA itself, which states
8  unequivocally that "both parties represent and warrant that they have obtained all
9  necessary approvals from their governing bodies to enter into and perform this
10 Agreement, and that the person signing this Agreement has proper authority to do so."
11 Decl. of Karen Rollins in Support of Pl.'s Mot, Ex. A., ¶ 10(d).
12    According to Roach, the current cost to remove the Hayden Hill line is now in
13 excess of $650,000 as Kinross has no current need for salvageable components at
14 another site. As indicated above, when Plaintiff purchased the line from Kinross, Kinross
15 could have met its reclamation obligations for as little as $38,000. Roach Decl., Defs.
16 Ex. C, ¶¶ 20-21. That cost has therefore increased dramatically in the intervening
17 period.

## STANDARD

21    The Federal Rules of Civil Procedure provide for summary judgment when "the
22 pleadings, depositions, answers to interrogatories, and admissions on file, together with
23 affidavits, if any, show that there is no genuine issue as to any material fact and that the
24 moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex
25 Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is
26 to dispose of factually unsupported claims or defenses. Celotex Corp., 477 U.S. at 325.
27 ///
28 ///

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying . . . the part of each claim or defense . . . on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Twp. of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp., 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).

///

1  Stated another way, "before the evidence is left to the jury, there is a preliminary
2  question for the judge, not whether there is literally no evidence, but whether there is any
3  upon which a jury could properly proceed to find a verdict for the party producing it, upon
4  whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement
5  Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the Supreme Court explained, "[w]hen the
6  moving party has carried its burden under Rule 56(c), its opponent must do more than
7  simply show that there is some metaphysical doubt as to the material facts . . . .
8  Where the record taken as a whole could not lead a rational trier of fact to find for the
9  nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.
10      In resolving a summary judgment motion, the evidence of the opposing party is to
11 be believed, and all reasonable inferences that may be drawn from the facts placed
12 before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at
13 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
14 obligation to produce a factual predicate from which the inference may be drawn.
15 Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,
16 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

**A.    The Brown Act.**

21     LMUD' Motion relies in large part on the provisions of the so-called Ralph M.
22 Brown Act, California Government Code § 54950, et seq. ("the Brown Act") in arguing
23 that the  PSA should be voided and summary judgment entered in its favor.  The Brown
24 Act provides for open meetings for local legislative bodies like the LMUD and requires
25 transparency, and public scrutiny, for such entities' deliberative processes. Ingram v.
26 Flippo, 74 Cal. App. 4th 1280, 1287 (Cal. App. 1999).
27 ///
28 ///

Significantly, however, Plaintiff's standing to rely on the provisions of the Brown Act in seeking a declaratory judgment that the PSA was void for lack of authority, and for corresponding restitution of the amounts paid pursuant to that agreement, is questionable given the language of the Brown Act itself.

Civil violation of the Brown Act, like those claimed by Plaintiff herein, are premised on §§ 54960 and 54960.1.  Section 54960 (a) provides that "[t]he district attorney or any interested action may commence and action…. for the purpose of preventing violations or threatened violations of this chapter by members of the legislative body of a local agency… "  Section 54960.1 goes on to provide that "the district attorney or any interested person" can obtain "a judicial determination that an action taken [by the body] is null and void."  The Brown Act goes on to specify, however, that certain notice must be provided prior to the suit in order to allow the legislative bade an opportunity to "cure or correct the challenged action"  Id. at § 54960.1(b)-(c).  An initial notice has to be made within 90 days from the date the challenged action is taken (or within 30 days if action was taken in open session).  Id.  Thereafter, if the legislative body takes no action within 30 days following receipt of the 90-day notice, an action may be commenced within 15 days.  Id.

This statutory scheme clearly appears to envision an action <u>against</u> the legislative body. There is no indication in the Brown Act that it was intended for use by a local legislative body like LMUD to avoid its own contractual obligations.  Indeed, at least one California decision has expressly made such a finding.  <u>Ingram v. Flippo</u>, 74 Cal. App. 4th at 1289 ('we believe [the Brown Act's] general purposes and basic principles… dictate that the defendant in any such action must be the entity which has allegedly violated the Act.").

///
///
///
///

Consequently, while the issue of Plaintiff's standing under the Brown Act is not squarely before the Court inasmuch as the present motion is directed against Defendants rather than the Plaintiff, the question certainly weighs against the propriety of affording Plaintiff any relief at all to the extent Plaintiff's demands for declaratory relief and restitution are predicated on the Brown Act.

Even if the Brown Act does apply, its substantive provisions by no means entitle Plaintiff to the summary judgment (or summary adjudication as to Frank Cady's alleged lack of authority) they request. Section 54956.8 specifically allows a local agency like LMUD to hold a closed session with its negotiator prior to any purchase of real property for purposes of granting authority to the negotiator regarding the price and terms of payment" for the property. All the statute requires is that prior to the closed session the legislative body publicly identify "its negotiators, the real property or real properties which the negotiations may concern, and the person or persons with whom the negotiators may negotiate." Cal. Gov't Code § 54956.8. Here, as stated above, the public agenda for the August 28, 2007 LMUD Board meeting contains a notice that complies with the terms of this statute. See August 28, 2007 Board Agenda, Defs.' Ex. R, p. 232.[8] Moreover, actual approval of an agreement concluding real negotiations pursuant to § 54956.8 can be reported under the Brown Act after the agreement is actually final. The Act explains that "if final approval rests with the other party to the negotiations, the local agency shall disclose the fact of that approval and the substance of the agreement upon inquiry by any person, as soon as the other party or its agent has informed the local agency of its approval." Cal. Gov't Code § 54957.1(a)(1)(B).

///

///

---

[8] While Plaintiff points to a somewhat cryptic statement in the August 28, 2007 Board Minutes themselves that "General Counsel Jones removed all the items from Closed Session" (Defs. Ex S at p. 240), any removal would not appear to vitiate the public disclosure of the potential sale afforded by the Agenda notice itself. Nor is the Court willing to speculate as to what "removal" of the closed items actually means for purposes of the present case (i.e., whether items were discussed, then removed, or whether no closed discussion occurred whatsoever). Any such determination in that regard requires the weighing of factual matters not appropriate for disposition on summary judgment.

12

According to Frank Cady's deposition testimony, the Board gave him authority in closed session, through consensus and by motion, to sign the agreement when the identified conditions precedent (dealing with price, remediation measures County acknowledgment) were satisfied. Cady Dep., Defs.' Ex. A to Erratum, pp. 29-32. 38, 49-54, 57-58. Cady explained that because he signed first and that because the absence of the other party's signature did not result in a final agreement, he believed that no open disclosure obligation had yet been triggered, and that even after execution by the other side (here Kinross) no disclosure was required unless requested by a member of the public. Id. at p. 106. That understanding appears consistent with the language of 54957.1(a)(1)(B) as set forth above, and Cady specifically cited that statute later in his deposition. Id. at p. 125. Not only is there no indication that LMUD declined to furnish information about the transaction once it was consummated, there is also evidence that the Hayden Hill line sales transaction was discussed publically in any event. See Board Minutes of May 27, 2008, Defs.' Ex. X, p. 271 (reflects an open session update provided by LMUD's General Manager Ray Luhring and General Counsel Jaimee Jones about the Hayden Hill line, along with a statement that "LMUD has a purchase agreement …and has taken possession of this line." LMUD's disavowal of the purchase, as stated above, did not occur until December 22, 2009, almost a year and a half later, and after LMUD had again ratified purchase of the line through Mr. Luhring's June 11, 2009 letter to SCLA homeowners ("The line was purchased, along with easements for the line to the extent they were owned by Lassen Gold Mining, by the District for a total price of $65,000" in December of 2007).

At the very least, the events as outlined above raise a material issue of fact as to whether Cady had approval to sign the PSA on LMUD's behalf. This is particularly true given the Brown Act's admonition that a Board action shall not be deemed null and void, as advocated by LMUD, if Board action is taken "in substantial compliance" with Brown Act requirements, including the closed session guidelines contained within § 54954.5 See Cal. Gov't Code §§ 54960.1(d)(1), 54954.5.

Even more significantly, as already stated, the Court is required to view the evidence in the light most favorable to Kinross, as the non-moving party, on a motion for summary judgment. Anderson, 477 U.S. at 255. Construing the evidence in that manner (and in particular with regard to Cady's deposition testimony) it becomes plain that summary judgment cannot be had with respect to Defendant's claim that purchase of the Hayden Hill line should be deemed null and void under the provisions of the Brown Act. That conclusion is further strengthened by LMUD's issuance of a check for the $65,000 purchase price signed not only by Frank Cady, but also by Treasurer (and Board member) Bruce Nagel, and certified as legitimate by Controller William Stewart.

**B.     The MUD Act.**

The conclusions made above with respect to the Brown Act apply equally to Plaintiff's alternative claim that the PSA violated the terms of the Municipal Utilities District Act, California Public Utilities Code § 11501, et seq. (the "MUD Act"). In particular, Plaintiff points to § 11909 of the MUD Act, which states that "[t]he acts of the board shall be expressed by motion, resolution or ordinance." While Plaintiff disputes that any such affirmative act occurred, Frank Cady testified that he was given the authority to execute the PSA on the District's behalf, through consensus or by motion in closed session. Cady Dep., Defs.' Ex. A to Erratum, pp. 29-32. 38, 49-54, 57-58. Board member Fred Nagel's testimony on this issue was less than unequivocal. Although he initially indicated that the Board did not give Cady authority to enter into the PSA with Kinross, he later appears to have testified that he did not recall whether the Board may have expressed its approval through consensus short of a formal motion. Nagel Dep., Ex. B. to Erratum, pp. 51-52. These factual discrepancies again prevent the Court from resolving this matter by way of summary judgment.

///

///

### C.     Equitable Defenses.

Even aside from the issue of whether a Brown or MUD violation may in fact have occurred, Plaintiff may nonetheless be precluded from disavowing the validity of the PSA if Defendants can show that Plaintiff either ratified the PSA, should be equitably estopped from repudiating the contract under the circumstances, or should be prevented from any disavowal of its obligation through application of the doctrine of laches.  All three equitable defenses are asserted by Defendants in their Answer to Plaintiff's complaint, and particular in the Third, Fourth and Seventh Affirmative Defenses contained therein.  See Answer, ECF No.10, p. 4.  Plaintiff asks the Court to conclude that none of these three defenses has any merit, and that it accordingly is entitled to summary adjudication as to the defenses.

As a preliminary matter, Plaintiff alleges that equitable defense like ratification and estoppel are particularly disfavored in the context of contracts with public agencies, citing authority which finds that anyone entering into such contracts is bound to take notice of agency and/or officer limitations in entering into valid, authorized agreements.  See, e.g., City of Pasadena v. Estrin, 212 Cal. 231, 236 (1931) ("Because of the limitations of its charter the plaintiff was therefore not bound by the alleged contract, either expressly or by estoppel or ratification.").   Here, however, unlike Estrin, no charter provisions have been cited which should have put Defendants on notice of any inability on Frank Cady's part to enter into a valid contract for purchase of the Hayden Hill line, provided he obtained the proper authorization to do so.  To the contrary, the PSA itself expressly states as follows:  "Both parties represent and warrant that they have obtained all necessary approvals from their governing bodies to enter into and perform this Agreement, and that the person signing this Agreement has proper authority to do so."  PSA, Ex. A. to Rollins Decl., p. 9.

///

///

15

Moreover, the Brown Act itself recognizes the availability of equitable defenses when it states, at § 54960.1, that an action shall not be determined null and void if "the action taken gave rise to a contractual obligation…, upon which a party has, in good faith and without notice of a challenge to the validity of the action, detrimentally relied." Cal Gov't Code § 54960.1(d)(3).

Defendants have offered no opposition to Plaintiff's request that the laches defense be adjudicated in its favor, and Plaintiff's motion as to that defense will accordingly be granted. As set forth below, however, the Court cannot say as a matter of law that the ratification and estoppel defenses lack merit. Indeed, as the Court will explain, the availability of those defenses provides yet another reason why summary judgment as to Plaintiff's action as a whole cannot be had.

### 1. Ratification

Even assuming the PSA is voidable for non-compliance with either the Brown Act or the MUD Act, or even if one further assumes for argument's sake that Frank Cady lacked the requisite authority to execute the PSA, that agreement is still subject to either express or implied ratification if LMUD duly recognized the contract following its consummation.

Ratification is the "subsequent adoption and affirmance by one person of an act which another, without authority, has previously assumed to do for him, while purporting to act as his agent." See Stone v. First Wyoming Bank, N.A., Lusk, 625 F.2d 332, 344 (10th Cir. 1980). The prerequisites for a defense based on ratification have been defined as follows:

> (1) acceptance by the principal of the benefits of the agent's act,
> (2) with full knowledge of the facts, and
> (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized agreement….

16

<u>Scott D. Erler, D.D.S. Profit Sharing Plan v. Creative Fin. & Investments, L.L.C.</u>, 203 P.3d 744, 752 (Mont. 2009). Contract ratification is the adoption of a previously formed contract which would otherwise be void. <u>Id</u>. Upon ratification, the party affirming becomes bound by the contract and entitled to all the benefits from it. <u>Id</u>. Ratification may be implied from any acts or conduct showing an intention to affirm the contract, which may include an acceptance of the benefits or burdens of the contract. <u>Id.</u>

  In response to any assertion that ratification in fact occurred in this instance, Plaintiff argues pointedly that LMUD's Board took no action to ratify Cady's authority to enter the PSA" and took neither "appropriate action to approve the PSA or [to] accept the benefits thereof." Pl.'s Mot., 12:28-13:2. That contention, however, is not borne out by the evidence. First, LMUD issued a check for the purchase price that was signed by Treasurer Fred Nagel, a Board member, and certified as a legitimate expense by LMUD's Controller, William Stewart. <u>See</u> Defs.' Ex. T, Defs.' Erratum to Opp., Dep. of William Stewart, Ex. C, pp. 15, 38. Second, the Minutes for the following January 22, 2008 meeting reflect that the check register from November 1, 2007 to January 18, 2008, which would have included the December 13, 2007 check to LGMI, was reviewed by the Board and no objection to the purchase expenditure was noted. Defs.' Ex W, pp. 251-52. Third, the Board minutes of May 27, 2008 confirm the fact that LMUD had not only purchased the Hayden Hill line, but had taken possession and accepted liability for the line. Defs.' Ex. X, p. 271. Finally, the District's own letter of June 11, 2009 to WCLA homeowners, a letter authored by General Manager Ray Luhring and copied on both LMUD's counsel and its Director or Electrical Operations, further confirms that LMUD "concluded a Purchase and Sale Agreement for the existing de-energized 69kV line previously owned by Lassen Gold Mining in December of 2007." Ex. A to Defs.' Mot. to Supplement Evidence, ECF No. 82.

  These actions all, at the very least, create triable issues of fact as to whether LMUD ratified the PSA, even if one assumes that Cady lacked authority to enter into the agreement on behalf of the District in the first place.

17

The fact that the inferences from this evidence have to be construed in favor of Defendants, as the non-moving party, further underscores the conclusion that summary adjudication as to the ratification defense asserted by Defendants would be improper.

### 2.     Estoppel.

An entity may be equitably estopped from disavowing the existence of a valid contract under certain circumstances.  First, the party to be estopped must be apprised of the facts.  Second, that party must intend that his conduct be acted upon, or act in such a way that the entity asserting estoppel is entitled to believe that such intent was present.  Third, the party seeking estoppel must be ignorant of the alleged true facts and must further rely upon the conduct to his injury and detriment.  City of Long Beach v. Mansell, 3 Cal.3d 462, 489 (1970).  Knowledge of the true facts will be imputed to one who ought to have such knowledge.  Id. at 491.

A governmental entity like LMUD can be bound by equitable estoppel when the above prerequisites are satisfied and where, in the view of a court sitting in equity, the injustice that would result from a failure to uphold the estoppel outweighs any otherwise detrimental effect on the public interest.  Id.at 496-97.  Moreover, as already noted, the Brown Act itself recognizes an estoppel defense when it provides that a contract shall not be determined to be null and void where a party has detrimentally relied on the contract in good faith and without notice of a challenge to the validity of the contract.  Cal. Gov't Code § 54960.1(d)(3).

Here, the express terms of the PSA itself provide that Cady had obtained the necessary approval to enter into the agreement and had the authority to do so.   PSA, Ex. A. to Rollins Decl., p. 9.  Additionally, the check issued to LGMI was signed not only by Cady but also by Fred Nagel, the District's Treasurer and a member of the Board of Directors.  The face of the check also contained an accounting seal attesting to its status as a "certified, authorized demand" on the District's coffers.

See Defs.' Ex. T, Defs.' Erratum to Opp., Dep. of William Stewart, Ex. C, pp. 15, 38. Under those circumstances it cannot be said as a matter of law that Defendants lacked a good faith belief in the propriety of the sale. There is also evidence, in the form of Board minutes and other correspondence, that LMUD and its Board were fully aware of the facts surrounding the transaction. Consequently, there is evidence that the first two prongs needed to assert an estoppel may be present.

Nor did the District's post-contract actions in recognizing the sale both in Board meetings and in other correspondence, as delineated above, give Defendants any notice that the sale was anything other than duly authorized and legitimate. Kevin Roach himself indicates that Defendants had no knowledge that Plaintiff had any intent or basis for disavowing the contract until two years had passed since its execution. Roach Decl., Defs.' Ex. C, ¶ 19. Finally, with respect to detrimental reliance, evidence has been presented that Defendants would have been able to perform needed remediation to remove the Hayden Hill line for as little as $38,000 prior to the time it sold, a figure that has now jumped to some $650,000. Roach Decl., ¶¶ 20-21. Therefore, the evidence suggests that all the requirements for equitable estoppel may be present, and this evidence plainly prevents this Court from summarily adjudicating the defense as unavailable under the circumstances present herein. Given what appears to be vastly increased remediation costs faced by Defendants if the PSA is found invalid, it also appears that manifest injustice could result if Plaintiff is permitted to disavow the PSA at this juncture. This factor also weighs against summary adjudication as to the availability of estoppel in this matter.

## CONCLUSION

As the foregoing should make clear, summary judgment in this case in Plaintiff's favor fails on several levels. There are questions about whether the Brown Act applies to Plaintiff's lawsuit in the first place.

Factual questions remain in any event as to whether Frank Cady's execution of the PSA on Plaintiff's behalf was unauthorized in the first place under either the Brown Act or the MUD Act. Even if Cady did lack the requisite authority, however, questions of fact are still present with respect to the availability of ratification and/or equitable estoppel defenses.  Those defenses, which cannot be ruled out given the evidence before the Court, could preclude Plaintiff from attempting to void the PSA at this juncture and therefore also make summary judgment inappropriate.  Plaintiff's Motion for Summary Judgment (ECF No. 27) is accordingly DENIED.  Plaintiff's alternative requests for summary adjudication are also DENIED, except that Plaintiff's request for summary adjudication as to Defendant's laches defense is unopposed and accordingly GRANTED.

   IT IS SO ORDERED.

Dated:  March 8, 2013

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT JUDGE